J-S14010-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DEREK JOHNS | : | |
| | : | |
| Appellant | : | No. 2022 EDA 2018 |

Appeal from the PCRA Order Entered June 29, 2018
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0005225-2006

BEFORE:   LAZARUS, J., NICHOLS, J., and PELLEGRINI*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED AUGUST 06, 2019**

Derek Johns appeals from the order, entered in the Court of Common Pleas of Bucks County, dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  Upon careful review, we affirm.

This Court has previously set forth the facts of this matter as follows:

On June 16, 2006, at approximately 7:00 p.m., [Johns] . . . was walking through Creekside Apartments (hereinafter "Creekside") in Bensalem, Buck County, PA[,] with William Jones (hereinafter "victim").  [Johns] shot the victim in the mouth with a Browning semiautomatic pistol chambering a .22 long rifle cartridge, placed the pistol in the victim's hand, and fled the scene on foot.  Minutes after the shooting, [Johns] was stopped by police, identified by a witness, and was arrested.

K.A.P., a 14[-]year[-]old witness, was playing cricket on a field at Creekside with several friends when he noticed the two men walking on the sidewalk within a few hundred feet of the cricket field.  K.A.P. testified that he saw the two black males walking shoulder to shoulder on the sidewalk when one of the males, who

_____

[1] 42 Pa.C.S.A. §§ 9541-9546.

_____

*   Retired Senior Judge assigned to the Superior Court.

was wearing a white t-shirt, pulled a gun from his waistband and pointed it at the victim's stomach and head. According to his testimony, K.A.P. heard a loud noise as the male in the white shirt fired the gun at the other's head. K.A.P. testified that after the man in the white shirt shot the victim, he placed the gun into the falling man's hand, screamed "oh shit, oh shit" and ran away.

K.I.P. was another 14[-]year[-]old witness who was playing cricket when the shooting occurred. K.I.P. testified that he saw the two men walking side by side, turned away to play cricket, heard a loud pop, and when he turned towards the noise, he saw one man on the ground, and another man running away. K.I.P. testified that the man wearing a white t-shirt and a black "doo-rag" (a tight fitting knit cap) ran in the direction of the Pathmark store, which is located on Dunks Ferry Road.

Within minutes, Bensalem Township Police Officer Thomas Jackson responded to Creekside after receiving a dispatch report that there was a victim at Creekside who had been pistol whipped and/or shot in the head. As Officer Jackson pulled up to the scene, he saw the victim lying on the sidewalk between two buildings. The officer approached [the victim] and noticed that he was lying on his side with a firearm in his hand, and the officer immediately kicked the weapon out of [the victim's] hand as a safety precaution. After initially noting that the wound to [the victim] appeared to be self-inflicted, the officer was approached by a witness who informed him that there was another man who had fled the scene.

Officer Samuel Karley also responded to the scene of the shooting at Creekside and began interviewing witnesses. The officer approached K.I.P. for an interview and learned that K.I.P. felt that he could identify the man he saw running from the scene of the crime. Officer Karley took K.I.P. into his patrol car and began driving around the Creekside neighborhood looking for the man that K.I.P. had seen flee the scene of the shooting.

During this same time frame, Sergeant William McVey of the Bensalem Township Police was responding to Creekside when he heard a description of the suspect over his radio. As Sergeant McVey neared Creekside, he saw a man fitting the description of the suspect walking west on Dunks Ferry Road approximately one-quarter to one-half mile away from the scene of the shooting. Officer McVey testified that the man was wearing a white t-shirt and a black skull-cap and identified [Johns] as the man that he

saw walking on Dunks Ferry Road. Sergeant McVey testified that he activated his lights, notified dispatch that he was exiting the vehicle to engage a suspect and yelled for [Johns] to stop, make his hands visible and come over to the vehicle. Sergeant McVey then asked [Johns] several questions regarding the incident at Creekside and [Johns] denied that he was at the scene or knew anything about the shooting. Sergeant McVey conducted a pat[-]down of [Johns'] outer clothing for officer safety when he felt a rectangular object in [Johns'] pocket. In order to make sure that the object did not have the potential to be used as a weapon, the Sergeant retrieved the item, which proved to be a cellular phone, from [Johns'] pocket.

During the pat down, Sergeant McVey received a radio transmission which notified him that Officer Karley had an eye witness in his vehicle and that he would be bringing the witness to the stop location to attempt an identification. Sergeant McVey placed [Johns] in handcuffs and moved him to the rear of the car in order to see if a positive identification could be made.

According to K.I.P., as Officer Karley approached Sergeant McVey's vehicle, K.I.P. identified [Johns] from inside the squad car based on the clothes that [Johns] was wearing. Officer Karley testified that his patrol car was approximately 15 feet from [Johns] when K.I.P. said "that's him." Officer Karley then asked K.I.P. if he was 100% sure and K.I.P. affirmed his identification. Officer Karley notified Sergeant McVey via radio that K.I.P. had positively identified [Johns] and Sergeant McVey immediately advised [Johns] that he had been identified as the person fleeing the scene, and that he would be going back to the station.

Officer Mark Zdanowitz, who was already at the scene of the identification, placed [Johns] in his squad car and began driving to the station when [Johns] began yelling and questioning why he was being arrested. Officer Zdanowitz informed [Johns] that he was being detained for an investigation and that the Detectives wanted to talk to him at headquarters. At that point, the officer testified that [Johns] yelled, "I didn't do anything. I didn't shoot him, he shot himself." [Johns] also indicated that he would consent to police testing in order to prove his innocence.

Shortly after [Johns] arrived at the station, Corporal Greg Young administered a gun powder residue kit on [Johns'] hands. In addition, Corporal Young administered a gun powder residue test later that night on the [deceased] victim's hands. [John Evans of

the Pennsylvania State Police crime laboratory testified with a reasonable degree of scientific certainty that, based on the samples given to him, the sample taken from Johns' hands tested positive for gunshot primer particles. He indicated that he was unable to get a result regarding the sample taken from the victim's hands as the machine was not functioning properly at the time he attempted to run the analysis.]

***Commonwealth v. Johns***, 3060 EDA 2007 (Pa. Super. filed July 16, 2009) (unpublished memorandum decision), quoting Trial Court Opinion, 6/26/08, at 1-4 (citations to record omitted).

Johns was charged with criminal homicide and various firearms charges; the firearms charges were subsequently withdrawn. On May 18, 2007, a jury convicted Johns of third-degree murder. On May 24, 2007, the court sentenced Johns to 16 to 40 years' incarceration. Post-sentence motions were denied and Johns filed a direct appeal to this Court, which affirmed his judgment of sentence on July 16, 2009. ***See id.*** Our Supreme Court denied Johns' petition for allowance of appeal on March 9, 2010. ***See Commonwealth v. Johns***, 990 A.2d 728 (Pa. 2010) (Table).

On November 1, 2010, Johns filed a *pro se* PCRA petition. The PCRA court appointed counsel, Ronald Elgart, Esquire, who filed an amended petition. Johns claimed, *inter alia*, that trial counsel was ineffective for failing to retain an expert to testify that certain writings by the victim were suicide notes. On October 21, 2011, the court vacated Attorney Elgart's appointment and substituted current counsel, John J. Fioravanti, Jr., Esquire. On December 29, 2011, Attorney Fioravanti filed a motion requesting court approval for funds to retain expert forensic psychiatrist Harry A. Doyle, M.D., to perform a

"psychiatric autopsy" on the victim. By order dated January 23, 2012, the PCRA court ordered Attorney Fioravanti to "provide the legal authority and an outline of the factual basis which supports the proposition that the testimony of an expert witness may be introduced in [c]ourt to offer an opinion as to 'the nature' of notes left by a victim." Order, 1/23/12. Following a conference with counsel, on November 8, 2012, the court issued an order again directing counsel for Johns to submit the legal authority and factual basis for allowing the requested expert testimony. After the court granted counsel two extensions, on August 2, 2013, counsel filed a "Motion Seeking Authorization To Hire Expert And Basis For Admission Of His Testimony." In the motion, counsel averred that Dr. Doyle was well qualified to render an opinion, he possessed a specialized knowledge beyond that of a lay person, and his report set forth a detailed basis for his expert opinion. By order dated October 10, 2013, the court authorized payment to Dr. Doyle for his services in the amount of $1,500.

On January 8, 2015, the PCRA court granted counsel an extension of time "to develop a record and obtain evidence in support of same" and directed counsel to provide a status update by April 8, 2015. Order, 1/8/15. Counsel failed to provide the required status update. Accordingly, by order dated September 21, 2015, the court scheduled a status hearing to determine whether a full evidentiary hearing was required. At the status hearing, held on October 28, 2015, defense counsel requested additional time to allow Johns' family to secure funds to pay Dr. Doyle to testify at a hearing. The

Commonwealth requested time to file a response addressing the admissibility of Dr. Doyle's testimony. The court granted both requests.

On November 25, 2015, after receiving a draft of Dr. Doyle's report, the Commonwealth filed an "Answer In Opposition To Admissibility Of Expert Witness," in which it argued, *inter alia*, that: (1) Dr. Doyle's proffered opinion does not support Johns' claim; (2) Dr. Doyle's opinion is inadmissible under Pa.R.E. 404; and (3) Dr. Doyle's opinion is purely speculative and is neither relevant nor material. The parties briefed the issue and, on June 10, 2016, the PCRA court issued notice of its intent to dismiss Johns' petition[2] without a hearing pursuant to Pa.R.Crim.P. 907. Included in the Rule 907 notice was an instruction that Johns identify any remaining claims and make an offer of proof of any additional facts to be developed at an evidentiary hearing.

On June 17, 2016, Johns filed a "Second Amended PCRA Petition" in which he raised one new claim alleging that his sentence was illegal. After a conference held on June 27, 2016, Johns filed a motion seeking an evidentiary hearing on his multiple ineffectiveness claims—including the expert witness claim—as well as his illegality of sentencing claim. A hearing was held on December 21, 2016, at which Johns, Dr. Doyle, and trial counsel, Kenneth Hone, Esquire, all testified. The court directed the parties to submit post-hearing briefs.

---

[2] Although Johns raised multiple claims in his counseled amended PCRA petition, the Rule 907 notice and accompanying decision of the court addressed only the expert witness issue.

Johns filed his brief on April 11, 2017, along with a motion to again amend his PCRA petition. The court granted the motion and, on May 3, 2017, Johns filed his fourth amended petition, raising a new claim that trial counsel was ineffective for failing to object to the trial court's instruction on voluntary manslaughter. He also requested an additional evidentiary hearing. The Commonwealth filed its post-hearing memorandum, as well as an answer to Johns' fourth amended PCRA petition, on May 25, 2017. On September 27, 2017, the trial court issued an order scheduling a further evidentiary hearing for December 15, 2017. At the hearing, Johns and Attorney Hone testified regarding the claim raised in the fourth amended petition. Following the hearing, the court ordered the parties to file post-hearing briefs, which they did. On June 29, 2018, the PCRA court dismissed Johns' claims in their entirety. This timely appeal follows, in which Johns raises the following questions four our review:

> 1. Was trial counsel ineffective in failing to present expert testimony that the writings of the deceased were suicide notes?
>
> 2. Was trial counsel ineffective in failing to consult with [Johns] when the jury requested to review the autopsy [report] and preliminary hearing [notes of testimony] during deliberations?
>
> 3. Was trial counsel ineffective in failing to challenge the application of the five[-]year mandatory sentence under 42 Pa.C.S. § 9712 on constitutional grounds?
>
> 4. Was trial counsel ineffective in failing to challenge the competency of K.A.P. and in failing to argue taint?
>
> 5. Was trial counsel ineffective in failing to properly object to the trial court's jury charge on voluntary manslaughter?

Brief of Appellant, at 4.

We begin by noting our standard and scope of review of the denial of

PCRA relief:

> On appeal from the denial of PCRA relief, our standard and scope of review is limited to determining whether the PCRA court's findings are supported by the record and without legal error. Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level. The PCRA court's credibility determinations, when supported by the record, are binding on this Court. However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions.

*Commonwealth v. Medina*, 92 A.3d 1210, 1214–15 (Pa. Super. 2014)

(citations, quotation marks and brackets omitted).

All of Johns' claims assert the ineffectiveness of trial counsel.

Accordingly, we begin by noting that counsel is presumed effective, and it is

a petitioner's burden to prove otherwise. *Commonwealth v. Ousley*, 21

A.3d 1238, 1244 (Pa. Super. 2011). In order to prove that counsel was

ineffective, a petitioner must plead and prove each of the following: "(1) the

underlying legal claim is of arguable merit; (2) counsel's action or inaction

lacked any objectively reasonable basis designed to effectuate his client's

interest; and (3) prejudice, to the effect that there was a reasonable

probability of a different outcome if not for counsel's error." *Commonwealth*

*v. Grove*, 170 A.3d 1127, 1138 (Pa. Super. 2017) (citation omitted). A failure

to plead or prove any prong will defeat an ineffectiveness claim. *Id.* Further,

> [a] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence

resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place.

*Commonwealth v. Ligon*, 206 A.3d 515, 519 (Pa. Super. 2019) (citation omitted).

Johns first claims that trial counsel was ineffective for failing to present expert testimony that two notes, left by the victim and written in the days immediately preceding his death, were actually suicide notes.[3] Johns' defense

_____

[3] The first note, Exhibit D-1, was found by Jessica Fontanos, the victim's girlfriend, in the visor of her car on the afternoon of June 16, 2006. The victim had used Fontanos' car the day before he died. The prosecutor read the note into the record during Fontanos' testimony as follows:

> Q:  Jessica, let me give you a copy.  You tell me if I make any mistakes reading it.
>
> > ["]Yo pops, to break it cut and dry, I don't know what the fuck is coming but it is.  I stole a quarter key of coke from Derek Africa Johns and a boy named Hollywood from Bristol, PA.  Hollywood live in Bloomsdale section.  They have information on us.  How it was provided is anyone's guess because before I took it they never knew where I lived.  But Derek's brother is a guard at BCCF.  So I'm thinking that's how.  They called Jessica's crib a few times demanding shit.  I know where they're mothers stay but I could not keep waiting to see when to act on anything.  Anyhow, pops, I got all this little bit of info:  Derek Johns 2677975172, 183 asterisk 612 asterisk 7284.["]
>
> Jessica, do you know what those numbers represent with the asterisks? . . .
>
> A:  Nextel number.
>
> Q:  ["]Jimmy Hollywood Alea 2159467905, 2157811870, 183 asterisk 615 asterisk 12141.  The bag contains items of theirs, Africa and Hollywood, that would let someone know

theory was that the victim committed suicide because he had stolen drugs from Johns and feared for the safety of his family and that of his girlfriend. The defense postulated that the victim killed himself in an effort to protect his loved ones from retaliation by Johns.

At trial, the defense presented the testimony Richard Callery, M.D., a forensic pathologist. During his examination of Dr. Callery, defense counsel attempted to elicit testimony that the writings were suicide notes. The

---

> that our knowing of each other is no myth. There have been a lot of Puerto Rican faces on my back. Funny since I robbed an African and Nigga. You have to change names, Social Security numbers if possible, jobs, etcetera. Hopefully what I did bought yall some time.["]

Is that what D-1 says, Jessica?

A: Yes.

N.T. Trial, 5/7/07, at 188-89.

The second note, Exhibit D-2, was found by the victim's father in a pair of the victim's pants located in the trunk of the car he had driven to the scene of the incident and stated the following, as read into the record by the victim's father at trial:

> I did this here because my family and the Fontanos family on 325 Kings Clear are in grave danger. I took and had no idea what the hell was to come in the long run, but now I know, and I would like to get across to everybody that I am so sorry. Never do I have wished for anything like this. There aren't words that can explain my guilt or shame. I wish there were more I can say, but it all boils down to me making bad decisions and affecting those around me. But to my loved ones, . . . this outcome is the only way I could protect you from my wrongdoing.

N.T. Trial, 5/9/07, at 143.

Commonwealth objected, and the court sustained the objection on the basis that Dr. Callery did not possess any specialized skill, knowledge or training in the interpretation of putative suicide notes and that the question posed by defense counsel did not ask Dr. Callery to render an opinion within a reasonable degree of scientific certainty. In the PCRA court, Johns argued that trial counsel should have retained a qualified psychiatric expert to testify, rather than relying on the testimony of Dr. Callery, a forensic pathologist. In support of his claim, Johns retained Dr. Doyle, who prepared a "draft" report and subsequently testified at the December 21, 2016 hearing. Dr. Doyle's report was based solely on his review of the trial transcripts, the notes written by the victim, and a "summary report" prepared by trial counsel. *See* Draft Opinion of Dr. Doyle, 4/26/13, at 2. In that report, Dr. Doyle concluded:

> [B]ased upon the above record review, it is my opinion, within a reasonable degree of medical certainty, that [the victim] was experiencing acute, severe, unrelenting psychic pain/anxiety, intense fear for his personal safety and that of his girlfriend and relatives, intense feelings of guilt and shame for jeopardizing their safety and was desperate to protect his loved ones, all precipitated by an acute, self-imposed personal crisis, and that [sic], as a result, was at high risk for self-harm/suicide at the time of his death.

*Id.* at 10.

The PCRA court denied relief on the basis that Dr. Doyle's testimony was inadmissible because its content involved "matters that were within the common knowledge and experience of the jury members and [was] not of such a nature that would be beyond the understanding of the average juror." Decision, 6/10/16, at 13.

Pennsylvania Rule of Evidence 702 provides for the admission of expert testimony as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>>
>> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>>
>> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. Thus, to be admissible, the expert testimony must be beyond the knowledge possessed by a layperson and assist the trier of fact to understand the evidence or determine a fact in issue. *Commonwealth v. Walker*, 92 A.3d 766, 780 (Pa. 2014). Conversely, "[i]nferences drawn from the ordinary affairs of life" ought not to be drawn for the jury, and "turned over under oath from the witness stand." *Commonwealth v. Seese*, 517 A.2d 920, 921 (Pa. 1986). The decision of whether expert testimony is to be admitted lies within the sound discretion of the trial court, and this decision will not be reversed absent a clear abuse of discretion. *Commonwealth v. Bardo*, 709 A.2d 871, 878 (Pa. 1998).

> To satisfy the "arguable merit" prong for a claim of ineffectiveness based upon trial counsel's failure to call an expert witness, the petitioner must prove that an expert witness was willing and available to testify on the subject of the testimony at trial, counsel knew or should have known about the witness and the defendant was prejudiced by the absence of the testimony.

*Commonwealth v. Chmiel*, [] 30 A.3d 1111, 1143 ([Pa.] 2011); *Commonwealth v. Gibson*, [] 951 A.2d 1110, 1133 ([Pa.] 2008). Prejudice in this respect requires the petitioner to "show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Sneed*, [] A.3d 1096, 1109 ([Pa.] 2012) (quoting *Gibson*, 951 A.2d at 1134). Therefore, the petitioner's burden is to show that testimony provided by the uncalled witnesses "would have been helpful to the defense." *Id.* (quoting *Commonwealth v. Auker*, [] 681 A.2d 1305, 1319 ([Pa.] 1996)).

*Commonwealth v. Williams*, 141 A.3d 440, 460 (Pa. 2016).

Here, the PCRA court addressed this claim as follows:

In the instant case, the Commonwealth presented evidence of eyewitness testimony that [Johns] shot the victim and planted the gun in the victim's hand, forensic testimony of the pathologist and laboratory analysts, [Johns'] motive, implied threats made by [Johns] to the victim[,] and evidence of [Johns'] conduct and statements establishing his consciousness of guilt. [Johns], in turn, relied on [his own] statements that the shooting was a suicide, called his own forensic pathologist[,] and introduced the writings made by the victim, characterizing them as suicide notes, to support his defense of victim suicide.

The facts and arguments made by the parties at trial[] clearly identified for the jury's consideration[] whether [Johns] shot and killed the victim or whether the victim shot and killed himself. The content of Dr. Doyle's proposed testimony that the victim was at a high risk of self-harm or suicide based upon certain "facts" already heard by the jury are matters that were within the common knowledge and experience of the jury members and is not of such a nature that [it] would be beyond the understanding of the average juror. Written words meant to convey a message are, by their very nature, meant for and understandable by a lay person. As the trial court stated in its opinion, "Whether [the victim's] fear—for himself and his loved ones—would prompt him to kill himself, to surrender his gun to [Johns] by way of appeasement or even to seek to kill [Johns] was a matter for the jury to determine from all the evidence." . . . Ultimately, the jury was convinced that [Johns] did murder [the victim].

Decision, 6/10/16, at 67-68 (citation to record omitted).

- 13 -

We concur with the PCRA court's assessment, which is supported by the record and the law, that Dr. Doyle's testimony was inadmissible. A determination as to the victim's state of mind and whether his writings constituted suicide notes was well within the common knowledge, understanding, and life experience of the average juror. **Walker**, **supra**; **Seese**, **supra**. The jury was presented with the same underlying information as Dr. Doyle, including the victim's theft of guns and drugs from Johns, the various phone calls from Johns, the victim's distressed state of mind immediately prior his death, the content of the notes themselves, and the testimony of the medical examiner.[4] Dr. Doyle's own report conceded that his assessment "does not address whether an individual will or did suicide." Draft Opinion of Dr. Doyle, 4/26/13, at 7. Moreover, Johns' trial counsel was able to elicit testimony from the Commonwealth's own forensic pathologist that the victim's writings "look[ed] good for a suicide note," N.T. Trial, 5/10/07, at 171, and strenuously argued the defense theory of suicide during closing arguments.

In sum, the jury was familiar with the victim's circumstances and mindset in the several days preceding his death and was capable of making a determination based solely on the evidence presented at trial as viewed

---

[4] Importantly, Doctor Doyle never met or interviewed the victim personally prior to his death; nor is there evidence that any mental health records existed with respect to the victim. Moreover, the intended audience of the notes—the victim's father and loved ones—were themselves lay persons with no specialized knowledge of psychology or suicide risk-assessment.

- 14 -

through the prism of the jurors' own life experiences and common sense. As such, expert testimony was inadmissible under Rule 702. Accordingly, we can discern no abuse of discretion or error of law on the part of the PCRA court in concluding that Johns failed to establish that trial counsel was ineffective for failing to present expert testimony regarding the victim's state of mind.

Johns next asserts that trial counsel was ineffective for failing to consult with him when the jury asked to review the autopsy report and preliminary hearing testimony of witness K.A.P. during its deliberations. Johns asserts that the preliminary hearing notes would have revealed material inconsistencies in K.A.P.'s account of the incident and could have been used to impeach his trial testimony. In addition, in those instances where the Commonwealth had "exploit[ed] the preliminary hearing transcript[ by] pointing out areas of consistency with [K.A.P.'s] trial testimony," the ability to review the actual transcript would have revealed "that K.A.P. either did not understand what was being asked of him or that he was vulnerable to suggestibility or both." Brief of Appellant, at 32. With respect to the autopsy report, Johns asserts that, because the Commonwealth's forensic pathologist conceded that the victim's writing "looks good for a suicide note," and explained at trial the reasons he classified the victim's death as "undetermined," the jury should have been allowed to view the autopsy report. We find no merit to Johns' claim.

First, Pennsylvania Rule of Criminal Procedure 646 provides that, "[u]pon retiring, the jury may take with it such exhibits as the trial judge

deems proper," with certain exceptions not relevant here. Pa.R.Crim.P. 646(A) (emphasis added). In this case, neither the autopsy report nor the preliminary hearing transcripts were admitted into evidence as exhibits at trial. Accordingly, the jury was not entitled to view these items during deliberations. *See Commonwealth v. Nahavandian*, 849 A.2d 1221, 1231–32 (Pa. Super. 2004), *vacated on other grounds*, 888 A.2d 815 (Pa. 2006) (cautionary instruction required where preliminary hearing transcript used at trial but never admitted into evidence given to jury in error).

Second, Johns has provided no support for the proposition that counsel has a duty to consult with his client regarding what the jury should be allowed to review during deliberations. Indeed, our Supreme Court has recognized no such duty. In *Commonwealth v. Mason*, 130 A.3d 601 (Pa. 2015), the Court, quoting *Florida v. Nixon*, 543 U.S. 175, 187 (2004), stated the following:

> An attorney undoubtedly has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. *Strickland*[ *v. Washington]*, 466 U.S. [668,] 688 [(1984)]. That obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." *Taylor v. Illinois*, 484 U.S. 400, 417–418 [] (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval). But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 [] (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n.1 [] (1977)

(Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

*Nixon*, 543 U.S. at 187[]. Though the High Court recognized in *Nixon* only a duty to consult with a defendant regarding "'important decisions,' which may include questions of overarching defense strategy," our jurisprudence has aligned itself with the Pennsylvania Rules of Professional Conduct to recognize a duty to gain the consent of a defendant regarding the overarching objective or purpose of a defense, and leaves to counsel the authority to control the many aspects involving strategy and tactics in achieving those objectives. *See* [*Commonwealth v.*] *Sam*, [] 635 A.2d [603,] 611–12 [(Pa. 1993)] (relying on Rule 1.2 of the Pennsylvania Rules of Professional Conduct wherein it provides that "a lawyer shall abide by a client's decisions concerning the objectives of representation").

*Mason*, 130 A.3d at 667–68.

Finally, Johns is unable to demonstrate that, but for counsel's failure to consult with him, the outcome of trial would have been different. *Grove*, *supra* (petitioner asserting ineffectiveness claim must demonstrate prejudice, such that there was reasonable probability of different outcome if not for counsel's error). First, as noted above, even if counsel had advocated for allowing the jury to view the documents, there was no legal basis for the court to grant such a request. *See* Pa.R.Crim.P. 646(A). Thus, the trial court would likely have denied counsel's request.

Second, even if the court had allowed the jury to view the documents, any suggestion that the outcome of trial would have differed is mere speculation, at best. Johns identifies nothing specific in the autopsy report that would have benefitted him. Rather, he simply identifies the report as a "critical aspect" of the case, without further elaboration. *See* Brief of

Appellant, at 33. "[B]oilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1128 (Pa. 2011).

With regard to the preliminary hearing transcripts, Johns' brief refers to contradictions and inconsistencies between witness K.A.P.'s preliminary hearing testimony and his trial testimony. However, while Johns provides citations to the relevant portions of the trial transcript, he provides no citations to the preliminary hearing transcript. "It is not this Court's responsibility to comb through the record seeking the factual underpinnings of Appellant's claim." *Commonwealth v. Samuel*, 102 A.3d 1001, 1005 (Pa. Super. 2014). *See* Pa.R.A.P. 2119(c) ("If reference is made to . . . any . . . matter appearing in the record, the argument must set forth . . . a reference to the place in the record where the matter referred to appears."). Nevertheless, we endeavored to locate support for Johns' claims, but were unable to discern any inconsistencies so significant that a review of the preliminary hearing transcripts by the jury would have altered the outcome of trial. Both the Commonwealth and the defense utilized portions of the preliminary hearing transcripts at trial to point out for the jury consistencies and inconsistencies in testimony. In addition to minor inconsistencies in testimony, the transcript contained much information that was damaging to the defense. As such, we fail to see how the verdict would have differed had the jury reviewed the transcript.

Johns next argues that trial counsel was ineffective for failing to challenge the constitutionality of the mandatory minimum sentence statute, 42 Pa.C.S.A. § 9712, pursuant to *Alleyne v. United States*, 570 U.S. 99 (2013). Specifically, at the time Johns was sentenced in 2007, section 9712 provided for a five-year mandatory minimum sentence where a defendant visibly possessed a firearm or replica of a firearm that placed the victim in reasonable fear of death or serious bodily injury during the commission of a violent offense. The applicability of the mandatory minimum was to be determined by the trial court by a preponderance of the evidence at the time of sentencing after considering the evidence adduced at trial and such other evidence as the parties presented at sentencing. In 2013, the United States Supreme Court issued its decision in *Alleyne*, which held that facts triggering the imposition of a mandatory minimum sentence must be found by the trier of fact beyond a reasonable doubt. Although trial counsel argued at sentencing against the imposition of the mandatory minimum, he did not specifically challenge its constitutionality. Johns now asserts that his counsel should have foreseen this eventual change in the law, given the existence of *Apprendi v. New Jersey*, 530 U.S. 466 (2000),[5] at the time of his

---

[5] In *Apprendi*, the U.S. Supreme Court held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.

sentencing, and challenged the constitutionality of the provision. Johns is entitled to no relief.

Johns' judgment of sentence became final in 2010, well before **Alleyne** was decided. As Johns concedes, the Pennsylvania Supreme Court, in **Commonwealth v. Washington**, 142 A.3d 801 (Pa. 2016), held that **Alleyne** does not apply retroactively to cases, such as his, pending on collateral review. Accordingly, he is not entitled to the benefit of that decision. Moreover, Johns' sentencing—the event forming the basis for his ineffectiveness claim—occurred in 2007, approximately six years prior to the decision in **Alleyne**. "It is well-settled that counsel cannot be deemed ineffective for failing to predict changes in the law." **Commonwealth v. Cousar**, 154 A.3d 287, 303 (Pa. 2017). In light of the foregoing, Johns is entitled to no relief on this claim.

Next, Johns asserts that trial counsel was ineffective for failing to challenge the competency of witness K.A.P. and for failing to argue that his testimony was tainted. Johns claims that, although counsel challenged K.A.P.'s competency to testify at the preliminary hearing stage,[6] he failed to do so with respect to his testimony at trial. Johns argues that the "numerous contradictions in K.A.P.'s testimony and the unusual way that the police

_____

[6] Johns' counsel at the time of the preliminary hearing did not actually challenge K.A.P.'s competency to testify. Rather, new trial counsel filed a pretrial motion to remand for another preliminary hearing based on the fact that K.A.P. was 13 years old at the time he testified and there had been no inquiry made into his competency. By the time that motion was before the court, K.A.P. had turned 14 years of age.

treated him suggested that trial counsel should have again challenged competency and taint." Brief of Appellant, at 41. These claims are meritless.

In Pennsylvania, the general rule is that every person is presumed to be competent to be a witness. ***Commonwealth v. Moore***, 980 A.2d 647, 649 (Pa. Super. 2009). ***See*** Pa.R.E. 601(a) ("Every person is competent to be a witness except as otherwise provided by statute or in these rules"). Pennsylvania law requires the court to examine child witnesses for competency. ***Moore***, 980 A.2d at 649–50. The Supreme Court of Pennsylvania has established that, when a witness is under the age of 14, the trial court must hold a competency hearing. ***Id.*** at 650, citing ***Rosche v. McCoy***, 156 A.2d 307, 310 (Pa. 1959) (holding that "competency is presumed where the child is more than 14 years of age. Under 14 there must be a judicial inquiry as to mental capacity, which must be more searching in proportion to chronological immaturity."). In order to determine competency, the following factors must be applied:

> There must be (1) such capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that [the child] is called to testify about[,] and (3) a consciousness of the duty to speak the truth.

***Rosche***, 156 A.2d at 310. "A child's competency to testify is a threshold legal issue that the trial court must decide, and an appellate court will not disturb its determination absent an abuse of discretion." ***Commonwealth v. Washington***, 722 A.2d 643, 646 (Pa. 1998).

Here, K.A.P. was 14 years of age at the time he testified at trial. Accordingly, his competency to testify was presumed. *See Rosche*, 156 A.2d at 310 ("When a witness is at least fourteen years old, he or she is entitled to the same presumption of competence as an adult witness."). Moreover, in denying Johns' motion for remand, the court made the following findings:

> My specific recollection of [K.A.P.'s] testimony [at the preliminary hearing] is that it was quite acute, that he was credible. His responses were entirely—what's the word I'm looking for?—they were responsive to each of the questions asked. He plainly understood what he was doing, certainly appeared to this [c]ourt to understand his responsibility to tell the truth, and took some pains with his answers. And I'm entirely satisfied that he was a capable witness. So the motion to remand is denied.

N.T. Pre-Trial Motions Hearing, 1/22/07, at 57-58. Thus, in light of K.A.P.'s age at the time of trial, as well as the trial court's evaluation of K.A.P.'s competency to testify when he was only 13 years old at the preliminary hearing, trial counsel cannot be deemed ineffective for failure to challenge K.A.P.'s competency to testify at trial.[7]

Johns also asserts that trial counsel was ineffective for failing to request a taint hearing as to K.A.P. Johns claims that such a hearing was appropriate because the police interviewed K.A.P. without his parents present and the same police officer who interviewed K.A.P. also drove him to court on the day

---

[7] Johns' reliance on *Commonwealth v. Mazzaccoli*, 380 A.2d 786 (Pa. 1977), is inapposite. In that case, the Court found that the trial court had abused its discretion in allowing a 15-year-old witness to testify. However, in that case, unlike here, the record demonstrated that "the witness had neither the ability to understand questions and communicate intelligent answers nor a consciousness of the duty to speak the truth." *Id.* at 787.

he testified. Johns also asserts that K.A.P. informed his investigator that "he told the police that he didn't see anything and was only reporting to them what he had heard from another of the juvenile witnesses." Brief of Appellant, at 42. Johns is entitled to no relief.

Our Supreme Court has defined taint as "the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child, rendering that child incompetent to testify." **Commonwealth v. Delbridge**, 855 A.2d 27, 35 (Pa. 2003).[8] The core belief underlying the theory of taint is that a child's memory is peculiarly susceptible to suggestibility so that, when called to testify, a child may have difficulty distinguishing fact from fantasy. **Id.** at 34-35 (citation omitted).

"Pennsylvania courts have clearly and unequivocally stated that taint is only 'a legitimate question for examination in cases involving complaints of sexual abuse made by young children.'" **Commonwealth v. Pena**, 31 A.3d 704, 707 (Pa. Super. 2011), quoting **Delbridge**, 855 A.2d at 39. A competency hearing is the appropriate venue to explore allegations of taint. **Delbridge**, 855 A.2d at 40. However, when a witness is at least 14 years old, he or she is entitled to the same presumption of competence as an adult

---

[8] In **Delbridge**, our Supreme Court held, as a matter of first impression, that taint is a legitimate question for examination in cases involving complaints of sexual abuse made by young children and that such determinations are to be made in the context of a competency hearing.

witness. *Id.* Accordingly, where a juvenile witness is over the age of 14 at the time of his or her trial testimony, any issue with his or her ability to correctly remember the events in question is properly a question of credibility, not of taint. ***Commonwealth v. Judd***, 897 A.2d 1224 (Pa. Super. 2006).

Here, Johns was not charged with sexual abuse of a child, which is the only circumstance under which our Supreme Court has held a taint inquiry to be appropriate. Moreover, K.A.P. was 14 years of age at the time of his testimony. As such, he was presumptively competent to testify and Johns was not entitled to a competency hearing or taint inquiry. K.A.P. was thoroughly cross-examined at trial, and it was the purview of the jury to make judgments as to his credibility. ***See id.*** As counsel cannot be deemed ineffective for failing to pursue a meritless challenge, Johns is entitled to no relief.

Finally, Johns claims that trial counsel was ineffective for failing to properly object to the trial court's jury charge as to voluntary manslaughter. Johns asserts that the trial court improperly expressed an opinion that "neither party in this case has come forward with any specific evidence which would bring into play either of the two factors which the law recognizes is essentially taking away malice." N.T. Trial, 5/18/07, at 15. Johns claims this statement had the effect of removing voluntary manslaughter from the jury's consideration and, accordingly, counsel's failure to object constituted ineffectiveness. Johns is entitled to no relief.

Preliminarily, we are mindful that:

[W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

*Commonwealth v. Charleston*, 94 A.3d 1012, 1021 (Pa. Super. 2014) (citation omitted).

In its initial jury charge, the court began with the following statement:

The defendant has been charged with taking the life of William Jones, which constitutes criminal homicide. I have no wish to intrude upon your role as the sole finders of fact, and so my discussion is going to require certain reference to the evidence relied upon by the parties, but obviously you should not interpret any of my comments as expressing a view that I think certain things have been proven or [not]. I merely refer to enough of the evidence and the contention of the parties as is necessary to make sense out of the legal principles involved.

N.T. Trial, 5/17/07, at 132 (emphasis added). The court proceeded to instruct the jury on each of the possible criminal homicide offenses, including voluntary manslaughter. *See id.* at 132-48.

Thereafter, during its deliberations, the jury requested clarification on the instructions for "murder three with malice" and "murder four." N.T. Trial, 5/18/07, at 2. In response to this inquiry, the trial court informed the jury that "[t]here is no fourth[-]degree murder. Voluntary manslaughter is the next step down[.]" *Id.* at 2-3. The jury also inquired as to "at what point should malice be considered[--]before, during or after the incident[?]" *Id.* at

3. In response to these inquiries, the court determined that "the best I'm going to be able to do with regard to all three of these is just go through the charge of criminal homicide as a whole." *Id.* The court repeated its admonition that nothing it said was to be taken by the jury as representing the court's opinion and that the members of the jury are "the sole finders of fact." *Id.* at 4. The court then proceeded to give the instruction for criminal homicide, charging on voluntary manslaughter as follows:

> Now, voluntary manslaughter—neither party in this case has come forward with any specific evidence which would bring into play either of the two factors which the law recognizes is essentially taking away malice. However, you're the finders of fact, you have the evidence in this case, and I've instructed you on voluntary manslaughter both because I think you have a right to know of that verdict option and because it will help you understand, if nothing else, by contrast and comparison, just how all of this whole of criminal homicide fits together.

*Id.* at 15. The court then explained the two circumstances that would remove malice from the equation: (1) "a state of sudden and intense passion which results from a serious provocation" and (2) "the mistaken but sincere belief that your actions are justified[.]" *Id.* at 16, 19.

Upon review of the evidence adduced at trial and the jury charge as a whole, we can discern no abuse of discretion on the part of the trial court. Johns' defense at trial was not one of provocation or self-defense, imperfect or otherwise. Rather, Johns argued that he did not shoot the victim at all, and that the victim committed suicide. Likewise, the Commonwealth

- 26 -

presented no evidence that would reasonably have supported a verdict of voluntary manslaughter.

In **Commonwealth v. Milton**, 421 A.2d 1054 (Pa. 1980), our Supreme Court addressed a nearly identical claim of ineffectiveness of counsel related to a jury charge on involuntary manslaughter. The complained-of portion of the charge in that case provided as follows:

> [W]hile I am submitting this count of the indictment to you for your consideration, it is the conclusion of this [c]ourt that [v]oluntary [m]anslaughter is really not present here, because there was no provocation offered insofar as this victim was concerned. However, it's only my opinion and, of course, basically it's your responsibility to make that determination. Therefore, I have covered with you the essential elements of [v]oluntary [m]anslaughter. You have a right, if you find, notwithstanding what I may have said about this case, if you find that there was provocation that made this an intentional killing on the part of this accused, then you may find him guilty of [v]oluntary [m]anslaughter. But keep in mind that it must be such provocation as would induce a reasonable man to lose control of his reasoning faculties and to enter into an uncontrollable frenzy which leads him to the use of deadly force.

*Id.* at 1055. The Supreme Court concluded that

> [e]xamination of the charge in its entirety, however, reveals that the elements of such crime were fully explained. Objection to expression of opinion as to the inappropriateness of a voluntary manslaughter conviction was likewise without merit since[:] 1) the jury was fully informed of its power to return a verdict of voluntary manslaughter, and 2) the jury was instructed that it was not bound by the court's opinion of the evidence.

*Id.*

Likewise, here, the trial court's instruction clearly, adequately, and accurately presented the law regarding voluntary manslaughter to the jury.

***Charleston***, ***supra***.  The court specifically stated that the jury is "the finder[] of fact, you have the evidence in this case, and I've instructed you on voluntary manslaughter . . . because I think you have a right to know of that verdict option[.]"  N.T. Trial, 5/18/07, at 15.  Finally, as in ***Milton***, the court made it clear to the jury that none of the court's references to the evidence during the jury charge should be taken as being representative of the court's opinion and, in any event, were not binding on the jury.

Because the jury charge was proper, counsel cannot be deemed ineffective for failing to object to the court's purported expression of opinion. ***Milton***, ***supra***.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/6/19